UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

HOLLIS M. GREENLAW, ET AL.        §
                                  §
v.                                §        CIVIL NO. 4:20-CV-311-SDJ
                                  §
DAVID KLIMEK, ET AL.              §

## MEMORANDUM OPINION AND ORDER

A family of real estate development financing companies and their controlling executives are trying to hold federal officials responsible for allegedly spreading lies, falsifying evidence, and unlawfully searching their headquarters to aid a notorious short seller's fraudulent scheme. But for this Court, the question is not whether such conduct violates the Constitution. The question here is whether, assuming the alleged constitutional violations exist, an implied cause of action for money damages is available to remedy such violations under the Constitution itself, more commonly known as a "*Bivens* action." *Hernandez v. Mesa*, 140 S.Ct. 735, 742–43, 206 L.Ed.2d 29 (2020); *accord Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 397, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). The answer is no. So the motion to dismiss currently before the Court, (Dkt. #25), will be **GRANTED**.

### I. BACKGROUND

This case arises from a securities-fraud investigation.[1] In 2015, an "infamous" short seller, J. Kyle Bass, and representatives from his hedge fund gave presentations

_____

[1] The following factual summary is derived from the allegations in the complaint, which the Court accepts as true for purposes of this order. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

1

about UDF[2] to officials from the Department of Justice, Securities and Exchange Commission, and Federal Bureau of Investigation. (Dkt. #60 ¶¶ 2, 88). These presentations allegedly contained false and misleading statements, including that UDF's business operated as a Ponzi scheme. (Dkt. #60 ¶ 88). Bass and his hedge fund delivered the presentations to facilitate a so-called "short and distort" scheme, (Dkt. #60 ¶¶ 86–92), which involves "shorting a stock and then spreading rumors in an attempt to drive down its price," (Dkt. #60 ¶ 83 (quoting James Chen, *Short and Distort*, INVESTOPEDIA, https://www.investopedia.com/terms/s/shortanddistort.asp (last updated Aug. 15, 2019))).

After attending these presentations, Assistant United States Attorney James Nicholas Bunch (one of the named defendants in this case) allegedly recruited FBI Special Agent David Klimek (another named defendant) to "conduct an unwarranted investigation of UDF." (Dkt. #60 ¶ 90). During the months that followed, Bass and his hedge fund routinely provided false and misleading information about UDF to Bunch and Klimek, as well as to SEC officials who were conducting a parallel civil investigation. (Dkt. #60 ¶¶ 9, 90–151). Bunch and Klimek used that information to advance their criminal investigation and simultaneously aid Bass's short and distort scheme. (Dkt. #60 ¶¶ 90–151). These officials also allegedly obstructed UDF's efforts to clear its name by intimidating its independent auditor. (Dkt. #60 ¶¶ 116–125).

---

[2] "UDF" is a family of real estate development financing companies, which includes Plaintiffs United Development Funding, L.P.; United Development Funding III, L.P.; United Development Funding IV; United Development Funding Income Fund V; UMT Holdings, L.P.; UDF Holdings, L.P.; United Mortgage Trust; and United Development Funding Land Opportunity Fund, L.P.

Meanwhile, Bass launched a smear campaign through news outlets and other media sources, encouraging them to publicize UDF's business and legal troubles. (Dkt. #60 ¶¶ 126–64). The scheme continued through 2015, damaging UDF's reputation and causing its stock to plumet. (Dkt. #60 ¶¶ 126–64).

Around the turn of the year, Special Agent Christine Edson (the other named defendant in this case) replaced Klimek as the lead investigator for the FBI. (Dkt. #60 ¶¶ 152–54). As Klimek did before her, Edson allegedly coordinated with Bass and his hedge fund to publicly spread misinformation about UDF in furtherance of the short and distort scheme. (Dkt. #60 ¶¶ 154–64). And in February 2016, with the assistance of Edson and Bunch, Bass drove the "final nail" in UDF's coffin. (Dkt. #60 ¶¶ 165–87). At Bass's request, Edson and Bunch applied for a warrant to search UDF's headquarters. (Dkt. #60 ¶¶ 165–68). In the affidavit supporting the warrant application, Edson and Bunch allegedly included false and misleading statements, which were supplied by Bass and his hedge fund, and omitted exculpatory information. (Dkt. #60 ¶¶ 165–68, 237, 246).

A magistrate judge in the Northern District of Texas issued the search warrant. (Dkt. #60 ¶¶ 167, 246). Six days later, the FBI raided UDF's headquarters. Federal agents seized, among other things, bank records, tax documents, and electronic devices. (Dkt. #60 ¶¶ 169–70). News broke about the raid in real time, and Nasdaq suspended trading of UDF stock. (Dkt. #60 ¶¶ 171–75). And once the dust had settled, UDF and its shareholders had suffered significant financial losses. (Dkt. #60 ¶¶ 171–75). All told, by October 2016, the short and distort scheme

3

concluded with Bass netting $60 million and UDF investors losing more than $500 million. (Dkt. #60 ¶ 199).

Based on these allegations, UDF and four of its executives—Plaintiffs Hollis Greenlaw, Todd Etter, Cara Obert, and Benjamin Wissink (collectively, the "Executives")—filed this action. They claim that Defendants Bunch, Edson, and Klimek (collectively, the "Federal Officials") violated their constitutional rights when they allegedly "aided and abetted" Bass's "unlawful 'short and distort' scheme." (Dkt. #60 ¶¶ 4, 236–55). Specifically, they assert that the Federal Officials deprived them of due process in violation of the Fifth Amendment by leaking material nonpublic information, unlawfully obtaining a warrant to search their headquarters, and obstructing UDF's independent auditor. (Dkt. #60 ¶¶ 236–43). UDF and the Executives also claim that the Federal Officials violated their Fourth Amendment right to be free from unreasonable searches and seizures by knowingly making misrepresentations and omitting material facts in the affidavit submitted to obtain the search warrant. (Dkt. #60 ¶¶ 244–55). And they seek damages from the Federal Officials to remedy these alleged constitutional violations. (Dkt. #60 ¶¶ 220–35).

The Federal Officials now move to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6).[3] (Dkt. #25). They argue that UDF and the Executives do

---

[3] By separate motion, (Dkt. #30), UDF and the Executives request that the Court strike and disregard two exhibits attached to the Federal Officials' motion to dismiss, (Dkt #25-1); (Dkt. #25-2). A district court has "complete discretion to determine whether or not to accept any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion." *Isquith v. Middle S. Utils., Inc.*, 847 F.2d 186, 193 n.3 (5th Cir. 1988) (quotation omitted). Here, the Court declines to consider the exhibits at issue in reaching its decision today. Although the exhibits contain some matters of which a court may take judicial notice under Federal Rule of Evidence 201, the Court need not rely on those matters to resolve

not have a cause of action under *Bivens* and, in the alternative, that both qualified immunity and the statute of limitations independently bar the claims against them.

## II. LEGAL STANDARD

Under Rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). To survive a Rule 12(b)(6) motion to dismiss, a complaint must provide "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). The Supreme Court has instructed that plausibility means "more than a sheer possibility," but not necessarily a probability. *Iqbal*, 556 U.S. at 678.

When assessing a motion to dismiss under Rule 12(b)(6), the facts pleaded are entitled to a presumption of truth, but legal conclusions that lack factual support are not entitled to the same presumption. *Id.* To determine whether the plaintiff has pleaded enough to "nudge[] [its] claims . . . across the line from conceivable to plausible," a court draws on its own common sense and judicial experience. *Id.* at 679–80 (quoting *Twombly*, 550 U.S. at 570). This threshold is surpassed when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678.

## III. DISCUSSION

The Federal Officials seek dismissal of the complaint on three bases. They first argue that *Bivens* does not provide a vehicle for UDF and the Executives' claims.

---

the Federal Officials' dismissal motion. Thus, exercising its broad discretion, the Court will grant UDF and the Executives' motion to strike.

Next, the Federal Officials assert that—even if the *Bivens* claims are cognizable— they are entitled to qualified immunity because the facts alleged do not show they violated any clearly established constitutional right. Finally, the Federal Officials contend that the claims against them are time-barred. The Court begins with the *Bivens* question, which is antecedent to whether the Federal Officials are entitled to qualified immunity and whether the applicable statute of limitations bars the claims at issue. *See Oliva v. Nivar*, 973 F.3d 438, 441 (5th Cir. 2020).

## A. The *Bivens* Framework

Congress has provided a statutory cause of action against state officials for constitutional violations, 42 U.S.C. § 1983, but has provided no such cause of action against federal officials. Instead, it was the Supreme Court that stepped in and recognized an implied damages action under the Constitution in *Bivens*. There, the Supreme Court held that the Fourth Amendment itself supplied an implied cause of action to sue federal officials for entering and searching an individual's home without a warrant, manacling him in front of his family, and strip-searching him. 403 U.S. at 389–90. During the decade that followed, the Supreme Court recognized two more implied damages actions under the Constitution: one under the equal protection component of the Fifth Amendment against a congressman for employment discrimination on the basis of sex, *Davis v. Passman*, 442 U.S. 228, 248–49, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979), and one under the Eighth Amendment against federal jailors for failure to provide adequate medical care, *Carlson v. Green*, 446 U.S. 14, 19, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980).

6

That trilogy of cases is the product of an "*ancien regime*" that ended long ago. *Ziglar v. Abbasi*, 137 S.Ct. 1843, 1855, 198 L.Ed.2d 290 (2017) (quoting *Alexander v. Sandoval*, 532 U.S. 275, 287, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001)). In later years, the Supreme Court "came to appreciate more fully the tension" between recognizing an implied damages action against federal officials and "the Constitution's separation of legislative and judicial power." *Hernandez*, 140 S.Ct. at 741. Congress, the Supreme Court has since repeatedly cautioned, "is best positioned to evaluate whether, and the extent to which, monetary and other liabilities should be imposed upon individual officers and employees of the Federal Government based on constitutional torts." *Id.* at 742 (quotation omitted).

Despite that admonishment, the Supreme Court has said that *Bivens*, *Davis*, and *Carlson* remain good law. *See Abbasi*, 137 S.Ct. at 1856–57. But it has also described the "expansion of *Bivens*" as "a disfavored judicial activity" and observed that if the "three *Bivens* cases had been decided today, it is doubtful that [the Supreme Court] would have reached the same result." *Hernandez*, 140 S.Ct. at 742–43 (cleaned up). And for more than forty years, the Supreme Court has "consistently rebuffed requests to add to the claims allowed under *Bivens*." *Id.* at 743 (collecting cases).

Against this backdrop, a court engages in a "two-step inquiry" to determine whether an implied damages action against federal officials may proceed under *Bivens. Id.* First, the court must consider whether the asserted claim "arises in a new context or involves a new category of defendants." *Id.* (quotation omitted). If so, the

court must proceed to the second step and ask "whether there are any special factors that counsel hesitation" against extending *Bivens* to the new claim. *Id.* (cleaned up). When such special factors are present, a *Bivens* action is not available.

## B. Application of the *Bivens* Framework

The Court now turns to the Fourth and Fifth Amendment claims at issue in this case. And for the reasons that follow, the Court concludes that no *Bivens* cause of action is available for either of the factually intertwined claims.

### 1. Step One: New Context

The Court begins with the Fifth Amendment due-process claim. According to UDF and the Executives, the Federal Officials violated their Fifth Amendment rights by, among other things, leaking material nonpublic information, unlawfully obtaining a warrant to search their headquarters, and intimidating UDF's independent auditor. (Dkt. #60 ¶¶ 237–41). To repeat, the Federal Officials allegedly took these actions to aid and abet Bass's short and distort scheme. Everyone here, including the Court, agrees that this claim arises in a new *Bivens* context. (Dkt. #25 at 8); (Dkt. #29 at 9). And for good reason: "No one thinks *Davis*—which permitted a congressional employee to sue for unlawful termination in violation of the Due Process Clause—means the entirety of the Fifth Amendment's Due Process Clause is fair game in a *Bivens* action." *Cantú v. Moody*, 933 F.3d 414, 423 (5th Cir. 2019); *see also Schweiker v. Chilicky*, 487 U.S. 412, 420, 108 S.Ct. 2460, 101 L.Ed.2d 370 (1988) (denying a *Bivens* action under the Fifth Amendment's Due Process Clause for wrongful denial of disability benefits).

UDF and the Executives, however, contend that their Fourth Amendment claim does not arise in a new context. They assert that the Federal Officials violated their right to be free from unreasonable searches and seizures by making material misrepresentations and omitting critical, exculpatory facts in the affidavit submitted to obtain the search warrant. (Dkt. #60 ¶¶ 245, 246). This knowing and reckless misconduct, UDF and the Executives say, resulted in the unlawful search of their corporate headquarters and seizure of various effects stored there. (Dkt. #60 ¶¶ 245, 246). Again, the Federal Officials allegedly took these actions to financially damage UDF and ruin its reputation in furtherance of Bass's short and distort scheme. (Dkt. #60 ¶¶ 248–50, 253–55).

The new-context inquiry in this case is straightforward. "If the case is different in a meaningful way from previous *Bivens* cases decided by [the Supreme] Court, then the context is new." *Abbasi*, 137 S.Ct. at 1859. To guide this inquiry, the Supreme Court has provided a non-exhaustive "list of differences that are meaningful enough to make a given context a new one":

> [1] the rank of the officers involved; [2] the constitutional right at issue; [3] the generality or specificity of the official action; [4] the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; [5] the statutory or other legal mandate under which the officer was operating; [6] the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or [7] the presence of potential special factors that previous *Bivens* cases did not consider.

*Id.* at 1859–60. The Supreme Court has also indicated that the involvement of a "new category of defendants" is a meaningful difference. *See Hernandez*, 140 S.Ct. at 743 (quoting *Correctional Services Corp. v. Malesko*, 534 U.S. 61, 68, 122 S.Ct. 515, 151

L.Ed.2d 456 (2001)). Under these "broad" criteria, *id.*, "even a modest extension" of the *Bivens* trilogy "is still an extension," so "the new-context inquiry is easily satisfied," *Abbasi*, 137 S.Ct. at 1864–65.

As to UDF and the Executives' Fourth Amendment claim, the most analogous case in the *Bivens* trilogy is *Bivens* itself. After all, *Bivens*, too, was a Fourth Amendment case that involved alleged violations of the prohibition on unreasonable searches and seizures. But courts "do not define a *Bivens* cause of action at the level of 'the Fourth Amendment' or even at the level of 'the unreasonable-searches-and-seizures clause.'" *Cantú*, 933 F.3d at 422. Indeed, "it is not enough even if 'a plaintiff asserts a violation of the same clause of the same amendment *in the same way*.'" *Oliva*, 973 F.3d at 442 (quoting *Cantú*, 933 F.3d at 422).

This case is different in several meaningful ways from *Bivens*. First, the "alleged misdeeds" here are "different from those in *Bivens*." *Farah v. Weyker*, 926 F.3d 492, 498 (8th Cir. 2019). This is not a case in which an individual claims that officers entered his home without a warrant, manacled him in front of his family, and conducted a strip-search without justification. *See Oliva*, 973 F.3d at 443 (contrasting alleged misconduct underlying an excessive-force claim with the officers' actions in *Bivens*). Rather, this is a case about investigators and a prosecutor who allegedly falsified evidence in connection with a lengthy criminal investigation to facilitate a notorious investor's short and distort scheme. Speaking "to witnesses, draft[ing] reports, and shar[ing] information with prosecutors and other investigators" are "information-gathering and case-building activities" that represent

10

"a different part of police work than the apprehension, detention, and physical searches at issue in *Bivens*." *Farah*, 926 F.3d at 499. Simply put, the *Bivens* Court "never contemplated the kind of extensive data gathering, analysis, examination, and coordination" at issue in this case. *Annappareddy v. Pascale*, 996 F.3d 120, 136 (4th Cir. 2021) (quotation omitted). The connection between the Federal Officials' alleged misconduct and the injury thus "involves intellectual leaps that a textbook forcible seizure never does." *See Cantú*, 933 F.3d at 423.

Second, *Bivens* involved a *warrantless* search of an individual's home, whereas this case involves a search of a corporate headquarters conducted *with* a warrant. This distinction also is crucial: the Federal Officials were operating under a different "legal mandate," *Abbasi*, 137 S.Ct. at 1860, than were the officers in *Bivens*, who executed a warrantless search without probable cause. Judicial guidance and legal standards vary across Fourth Amendment contexts. *See Cantú*, 933 F.3d at 423. And "the Fourth Amendment sharply distinguishes between with-warrant and warrantless searches, treating the introduction of a warrant as a signal moment in the proceedings." *Annappareddy*, 996 F.3d at 135–36.

Third, UDF and the Executives' Fourth Amendment claim not only "involves different conduct by different officers from a different agency," *see Cantú*, 933 F.3d at 423, but seeks to hold accountable a new category of defendants: federal prosecutors. Defendant Bunch is a prosecutor, not an on-the-scene, investigative officer. His role as a federal officer—which includes reviewing evidence, deciding whether to seek a search warrant, and pursuing criminal charges—meaningfully differs from the

narcotics agents in *Bivens*, 403 U.S. at 389; the former congressman in *Davis*, 442 U.S. at 230; and the prison officials in *Carlson*, 446 U.S. at 16.

Finally, recognizing an implied cause of action here would pose a greater risk of intruding on the executive branch's investigatory and prosecutorial functions. *See Abbasi*, 137 S.Ct. at 1860. To prevail on their Fourth Amendment claim, UDF and the Executives would have to prove that the Federal Officials knowingly or recklessly submitted false statements or made omissions in the search warrant affidavit. *See Arizmendi v. Gabbert*, 919 F.3d 891, 897 (5th Cir. 2019) (citing *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978)). They also would have to establish that those false statements or omissions were material to the magistrate judge's finding of probable cause. *See id.* Such probing of the causal chain would involve delving into the evidence before several decisionmakers, including federal investigators and prosecutors. *Farah*, 926 F.3d at 499. This type of "fact-checking and conscience-probing," which *Bivens* did not require, "can, as the Supreme Court has warned, impose substantial costs." *Annappareddy*, 996 F.3d at 135–36 (cleaned up).

UDF and the Executives fail to grapple with these meaningful differences between their case and *Bivens*. They also do not offer any persuasive reason why this Court should depart from the robust consensus of binding and persuasive authority indicating that prosecutorial misconduct and fabrication of evidence cases present a new *Bivens* context. *See Cantú*, 933 F.3d at 423; *Annappareddy*, 996 F.3d at 134–37; *Farah*, 926 F.3d at 498–500; *Dalal v. Molinelli*, No. CV 20-1434, 2021 WL 1208901, at *4 (D.N.J. Mar. 30, 2021) (collecting cases). Instead, they urge the Court to follow

*Jacobs v. Alam*, 915 F.3d 1028 (6th Cir. 2019), a decision in which the Sixth Circuit held that *Bivens* provided an avenue for a fabrication-of-evidence claim post-*Abbasi*. *See id.* at 1038–39.

UDF and the Executives' reliance on *Jacobs* is misplaced. For one thing, *Jacobs* is not the law of this circuit. And to the extent the Fifth Circuit's application of *Bivens* differs from the Sixth Circuit's, the former controls. *See Cantú*, 933 F.3d at 423 (concluding that a Fourth Amendment claim presented a new context when the plaintiff alleged that officers "falsified affidavits" rather than "entered [a] home without a warrant"). But even taking *Jacobs* on its own terms, the case is readily distinguishable. *Jacobs* presented facts much more like *Bivens* than those alleged here: in both cases, the plaintiffs were arrested in their homes without warrants. *Compare Jacobs*, 915 F.3d at 1033–34, *with Bivens*, 403 U.S. at 389. What's more, the fabrication-of-evidence claim in *Jacobs* was not based on misstatements or omissions in a warrant affidavit; rather, the plaintiff claimed that officers planted physical evidence at the scene of his arrest. 915 F.3d at 1033–34, 1042. For these reasons, *Jacobs* lends little, if any, succor to UDF and the Executives.

In sum, the differences the Court has identified are "meaningful enough" that this case presents a new context for *Bivens* purposes. *Abbasi*, 137 S.Ct. at 1859. That leads the Court to the second part of the *Bivens* test.

## 2. **Step Two: Special Factors Counseling Hesitation**

The Court must now determine whether there are special factors that counsel hesitation against recognizing a new *Bivens* action for UDF and the Executives'

claims.[4] *See Hernandez*, 140 S.Ct. at 743. This inquiry focuses on "whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed." *Abbasi*, 137 S.Ct. at 1858. A special factor counseling hesitation is a feature of a case that "causes a court to pause before acting without express congressional authorization." *Id.* Several factors give this Court pause about extending *Bivens* here.

The first special factor is the existence of "an alternative remedial structure" to address the injuries of the kind UDF and the Executives have alleged. *Id.* Congress has created a discrete and limited set of remedies for individuals injured by governmental misconduct during criminal prosecutions. "The so-called Hyde Amendment allows courts to award attorney fees to criminal defendants who prevail against 'vexatious, frivolous, or . . . bad[-]faith' positions taken by the government." *Farah*, 926 F.3d at 501 (quoting Act of Nov. 26, 1997, Pub. L. No. 105-119, § 617, 111 Stat. 2440, 2519 (codified at 18 U.S.C. § 3006A note)). And for "those who are wrongly convicted and sentenced," damages may be available. *Id.* (citing 28 U.S.C. § 1495). That Congress has "expressly provided a damages remedy for some victims of this particular type of injury, but not for others, suggests that it considered the issue and made a deliberate choice." *Annappareddy*, 996 F.3d at 137 (quoting *Farah*, 926 F.3d at 502). This Court is reluctant to disrupt such deliberate policy decisions.

---

[4] Perhaps because of the significant overlap in the alleged wrongdoing underlying the Fourth and Fifth Amendment claims at issue, the parties do not address those claims separately for purposes of the special-factors inquiry. The parties also do not distinguish the alleged actions of the Federal Officials in their briefing but instead address them collectively as a whole. For the most part, the Court will do the same.

Congress also has established a statutory framework for remedying torts committed by federal officers—the Federal Tort Claims Act ("FTCA"). *Cantú*, 933 F.3d at 423 (relying on the FTCA's statutory scheme as a special factor counseling hesitation against recognizing a *Bivens* action for a fabrication-of-evidence claim). In *Carlson*, a case from the *ancien regime*, the Supreme Court said that the existence of an FTCA claim did not—standing alone—preclude a *Bivens* action. 446 U.S. at 23. But as both the Supreme Court and Fifth Circuit have since made clear, the limited scope of the FTCA's waiver of sovereign immunity and the remedies available under the Act nonetheless weigh against the expansion of *Bivens*. *Hernandez*, 140 S.Ct. at 748; *Oliva*, 973 F.3d at 444. That's because supplementing those remedies by judicial fiat could upset the existing remedial structure, which is "a convincing reason" for courts not to infer a new *Bivens* cause of action. *Abbasi*, 137 S.Ct. at 1858 (quotation omitted). In any event, the FTCA's statutory scheme is only one of several factors giving this Court pause, and its absence would not lead to a contrary result.

UDF and the Executives attempt to negate this special factor by arguing that these alternatives to a damages action are either unavailable to them or would not provide them with "roughly similar compensation." (Dkt. #29 at 17). True, the Supreme Court has discussed the availability of "roughly similar" remedies in one decision. *See Minneci v. Pollard*, 565 U.S. 118, 130, 132 S.Ct. 617, 181 L.Ed.2d 606 (2012) (declining to extend *Bivens*). But the Supreme Court has not mentioned that notion—let alone relied on it—since then. *See Hernandez*, 140 S.Ct. at 750 ("Congress's decision not to provide a judicial remedy does not compel us to step into

its shoes."); *Abbasi*, 137 S.Ct. at 1858, 1862–63 (saying nothing about similar or comparable compensation when addressing alternative remedies). To the contrary, the Supreme Court has left no doubt that even alternative forms of judicial relief that provide *no* compensation for victims, such as writs of habeas corpus and injunctions, counsel hesitation against extending *Bivens*. *Abbasi*, 137 S.Ct. at 1862–63 (citing numerous cases, including *Minneci*, 565 U.S. at 124–26). So has the Fifth Circuit. *Oliva*, 973 F.3d at 444 ("That the FTCA might not give [the plaintiff] everything he seeks is therefore no reason to extend *Bivens*.").

Another special factor here is "the length of time Congress has gone without statutorily creating a *Bivens*-type remedy for this context." *Cantú*, 933 F.3d at 423. Because respect for the separation of powers lies at the heart of the special-factors inquiry, this Court "must consider what Congress has done and what Congress has left undone." *Oliva*, 973 F.3d at 444. And because Congress has known for many years that the Supreme Court is, to put it mildly, disinclined to extend *Bivens*, "its 'failure to provide a damages remedy' here suggests 'more than mere oversight.'" *Cantú*, 933 F.3d at 423 (quoting *Abbasi*, 137 S.Ct. at 1862).

The final special factor at play in this case, especially as to UDF and the Executives' Fourth Amendment claim, is the need to avoid intrusion into executive-branch functions. *See Abbasi*, 137 S.Ct. at 1861 (considering whether a *Bivens* action "would require courts to interfere in an intrusive way with sensitive functions of the Executive Branch"). The allegations here—charging investigators and a prosecutor with spreading misinformation, falsifying evidence, unlawfully searching a business

16

headquarters, and interfering with an independent audit—arise from a complex, multi-agency investigation into UDF and the Executives' compliance with federal securities laws. Proving claims like these would not only "invite a wide-ranging inquiry into the evidence available to investigators [and] prosecutors" but could require a jury to determine "what officers knew, what they did not know, and their state of mind at the time." *Annappareddy*, 996 F.3d at 134 (cleaned up). Such "after-the-fact inquiries" pose the sort of "risk of intrusion on executive-branch authority to enforce the law and prosecute crimes" that counsels against extending *Bivens*. *Id.* (quoting *Farah*, 926 F.3d at 501).

UDF and the Executives disagree. They point to *Lanuza v. Love*, 899 F.3d 1019 (9th Cir. 2018), as support for the notion that the Judiciary is well suited to weigh the costs and benefits of allowing their damages action to proceed. In *Lanuza*, the Ninth Circuit extended a *Bivens* remedy to a Fifth Amendment due-process claim where an attorney for U.S. Immigration and Customs Enforcement forged a document to bar the plaintiff from applying for lawful permanent residence. 899 F.3d at 1027.

To be sure, similarities exist between *Lanuza* and this case. *Lanuza* did not involve a claim that sought to hold high-level policy makers, such as the Attorney General, accountable. *Id.* at 1028–29. Nor did *Lanuza* implicate national security or foreign policy concerns, or garner executive or legislative attention. *Id.* The same is true here. But some of the key rationales from *Lanuza*, a decision based on "narrow and egregious facts," *id.* at 1021, are inapplicable.

Notably, the defendant in *Lanuza* had already been criminally prosecuted and convicted of depriving the plaintiff of his rights under color of law. *Id.* at 1022–23; *accord* 18 U.S.C. § 242. Because the facts underlying the plaintiff's claim were undisputed and had been made public by the Government itself, allowing the lawsuit to proceed would "not require unnecessary inquiry or discovery into government deliberations or policy making," or other sensitive information. *Lanuza*, 899 F.3d at 1029–30. These unusual circumstances, the Ninth Circuit said, decreased the burden on executive-branch authority, *id.*, and made the administration of the case "particularly straightforward" because "the only question remaining" was "the amount of damages," *id.* at 1033.

This Court does not have those same assurances. To the Court's knowledge, none of the named defendants face criminal charges. Nor have they admitted to the allegations against them. And the criminal prosecution that followed the multi-agency investigation at the heart of this civil suit has only just begun.[5] Thus, the risk of interfering in the executive branch's investigative and prosecutorial functions is significantly greater here than in *Lanuza*.

Another important point in *Lanuza* was that the defendant's submission of the falsified document completely barred the plaintiff from using the only remedial

---

[5] The criminal prosecution related to the underlying investigation challenged in this civil action began on October 15, 2021, *see* Indictment, *United States v. Greenlaw*, 4:21-CR-289-O (N.D. Tex. Oct. 15, 2021), ECF No. 1, and is currently underway in the Northern District of Texas, *see, e.g.*, *id.* ECF no. 166 (designating expert witnesses). The Court takes judicial notice of these facts under Federal Rule of Evidence 201. *Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011) (explaining that it is proper in deciding a Rule 12(b)(6) motion to take judicial notice of "matters of public record directly relevant to the issue at hand").

scheme available to him. *Id.* at 1031–32. But here, as the Court explained above, there is "an alternative remedial structure" in place to address injuries of the sort UDF and the Executives have alleged, even if it does not go as far as a *Bivens* remedy would. *Abbasi*, 137 S.Ct. at 1858.

The court in *Lanuza* also justified its extension of *Bivens* based on the language of the Immigration and Nationality Act ("INA"). 899 F.3d at 1030–31. According to the Ninth Circuit, the INA's text shows that "Congress contemplated that civil actions would be maintained against . . . federal immigration officers . . . when their actions allegedly violate the Constitution or other laws." *Id.* at 1031. So, while the INA itself lacks an express damages remedy, the Ninth Circuit reasoned that extending *Bivens* would not create a private remedy under the Act where a cause of action does not exist. *Id.* Here, in contrast, UDF and the Executives have not pointed to any similar statutory language supporting their proposed *Bivens* action against the Federal Officials.

For each of these reasons, *Lanuza* is distinguishable. UDF's claims, instead, more closely mirror those that the Fifth Circuit—along with most of its sister circuits—have rebuffed because special factors counseled against extending *Bivens*. *See Cantú*, 933 F.3d at 423–24 (declining to recognize *Bivens* action for fabrication-of-evidence claim based on, among other factors, the FTCA and "the length of time Congress has gone without statutorily creating a *Bivens*-type remedy for this context"); *Annappareddy*, 996 F.3d at 134–35, 137–38 (same, citing existence of alternative remedial schemes and intrusion into executive-branch functions); *Farah*,

926 F.3d at 500–02 (same); *Williams v. Keller*, No. 21-4022, 2021 WL 4486392, at \*3–
4 (10th Cir. Oct. 1, 2021) (unpublished) (same). Because special factors likewise
counsel judicial hesitation here, whether to allow plaintiffs who have been wrongfully
investigated and financially harmed based on allegedly falsified evidence to sue
federal officials for damages "is a decision for the Congress to make," not this Court.
*See Abbasi*, 137 S.Ct. at 1860.

* * *

Over the past four decades, the Supreme Court has "consistently refused to
extend *Bivens* to any new context or new category of defendants." *Id.* at 1857 (quoting
*Malesko*, 534 U.S. at 68). This case both arises in a new context and—at least to the
claims against Defendant Bunch—involves a new category of defendants. There also
are special factors that counsel hesitation against extending an implied cause of
action into this new *Bivens* context. So this Court "may not create a cause of action,
no matter how desirable that might be as a policy matter." *Cantú*, 933 F.3d at 424
(cleaned up). And because UDF and the Executives' claims are not cognizable under
*Bivens*, the Court need not address the Federal Officials' alternative arguments for
dismissal based on qualified immunity and the statute of limitations. Instead, the
Court will grant the Federal Officials' motion to dismiss.[6]

---

[6] Doe Defendants #1–10, who are alleged to be additional "Unknown FBI Agents,
Assistant United States Attorneys, and/or Other Unknown Government Attorneys"
responsible "in some manner" for the misconduct alleged in the complaint, (Dkt. #60 ¶ 47),
remain in this case. But for the reasons the Court has given above, UDF and the Executives
cannot maintain a *Bivens* action against any of the Doe Defendants. Thus, as with the claims
against the Federal Officials, the Court will dismiss the claims against Doe Defendants #1–
10 with prejudice. *See Anokwuru v. City of Houston*, 990 F.3d 956, 967–68 (5th Cir. 2021)
(holding that a district court may dismiss *sua sponte* a complaint for failure to state a claim,

## IV. Conclusion

For the foregoing reasons, it is **ORDERED** that UDF and the Executives'
Motion to Strike Exhibits From Defendants' Motion to Dismiss Complaint, (Dkt. #30),
is **GRANTED**.

It is further **ORDERED** that Defendants' Motion to Dismiss the Complaint
under Rule 12(b)(6), (Dkt. #25), is **GRANTED**. All claims against Defendants
Klimek, Bunch, Edson, and Does 1–10 are therefore **DISMISSED with prejudice**.

**So ORDERED and SIGNED this 27th day of December, 2021.**

_____
SEAN D. JORDAN
UNITED STATES DISTRICT JUDGE

---

even without prior notice, if the plaintiff has "had a fair opportunity to plead his best case
before dismissal").